**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**
**Judge Robert E. Blackburn**

Civil Case No.  03-cv-2218-REB-CBS

LIBERTY SAVINGS BANK, FSB,

      Plaintiff,

v.

WEBB CRANE SERVICE, INC., a Colorado corporation,
JEFFREY A. WEINMAN, the Webb Crane Service, Inc., Chapter 7 Bankruptcy Trustee,
KLW & W, LLC, a Colorado corporation,
DAVID E. LEWIS, the KLW & W, LLC Chapter 7 Bankruptcy Trustee,
WILLIAM WEBB (a/k/a Will Webb), an individual,
KELLY WEBB, an individual,
LESLIE WEBB, an individual,
JOHN FORIER, an individual. and
GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation,

      Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT**
**GE CAPITAL'S MOTION FOR SUMMARY JUDGMENT, &**
**DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT**

---

**Blackburn, J.**

      This matter is before me on the following motions: 1) defendant General

Electric Capital Corporation's (GE) motion for summary judgment against plaintiff

[#153], filed November 1, 2004; and 2) plaintiff Liberty Savings Bank, FSB's (Liberty)

Motions for Summary Judgment [#s 156 and 158], filed November 1 and November 3,

2004.  Liberty's two motions seek the same relief.  I grant in party and deny in part

defendant GE's motion.  I deny plaintiff's motions. [1]

I have subject matter jurisdiction over this case under 28 U.S.C. §§ 1331, 1332,

and 1367.  In fashioning my ruling I have judicially noticed all adjudicative facts in the

file and record of this action *pro tanto*.  I have considered the pleadings, discovery,

and affidavits on file, together with the arguments advanced and authorities cited by

the parties in their respective briefs. I have employed the analysis required by

apposite law. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 250 (1986);

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Matsushita Electric Industrial

Co. v. Zenith Radio Corp*., 475 U.S. 574, 587 (1986); *Applied Genetics Int'l, Inc. v.

First Affiliated Sec., Inc*., 912 F.2d 1238, 1241 (10th Cir.1990); *Redmon v. United

States*, 934 F.2d 1151,1155 (10th Cir. 1991); and *Concrete Works, Inc. v. City &

County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994).

## I.  FACTS

This case concerns a claim by a creditor, plaintiff Liberty Savings Bank, that its

debtor, defendant Webb Crane Service, Inc. (Webb), defrauded Liberty by making

false statements in the financial statements Webb provided to Liberty, and by using

funds borrowed from Liberty for purposes not authorized under the terms of the loan

agreement between Liberty and Webb.  Liberty claims also that a second creditor of

Webb, defendant GE Capital Corporation (GE), participated in the fraud by aiding and

---

[1]  The issues raised by and inherent to the motion for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motion stands submitted on the papers. *Cf.* **FED. R. CIV. P. 56(c)** and **(d)**. *Geear v. Boulder Cmty. Hosp.*, 844 F.2d 764, 766 (10th Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

encouraging Webb's efforts to defraud Liberty.  Eventually, GE filed an involuntary bankruptcy petition concerning Webb.  Liberty claims that GE violated the automatic stay after the bankruptcy petition was filed.

Webb operated a crane rental service.  From March, 1997, through March, 2003, Liberty provided a revolving line of credit to Webb.  At all times, Webb promised that proceeds from the line of credit would be used only for the operations of Webb's crane business.  Defendants William, Leslie, and Kelly Webb (the Webbs) were the shareholders, directors, and officers of Webb Crane at the relevant times.

In 1996, before Webb had a financial relationship with Liberty, William, Kelly, and Leslie Webb, along with another individual, formed a limited liability company known as KLW&W, LLC (KLWW).  KLWW was created to purchase and hold a forty-acre parcel of real estate in Gypsum, Colorado.  KLWW planned to use a portion of the Gypsum property for a new facility for Webb's planned expansion into the Western slope area of Colorado.  The remainder of the site was to be developed and sold in parcels.  The development was named the Spring Creek Industrial Park (SCIP). Beginning in 1997, Webb began diverting some of its funds to KLWW to fund the purchase and development of the Gypsum property.  Liberty alleges that some of these diversions involved funds loaned to Webb by Liberty which improperly were used for purposes other than the operation of Webb Crane's business.

GE supplied Webb Crane with equipment financing for the purchase of cranes and other equipment.  Webb rented, and sometimes sold, this equipment to its customers to generate income.  GE claims it had a perfected security interest in the equipment it financed.  Liberty claims GE's security interest is invalid.

Webb provided financial statements for calendar years 2000 and 2001 to both Liberty and GE. In its 2000 financial statement, according to GE, Webb reported for the first time that Webb held long term notes receivable from related parties for over 1.1 million dollars, and accounts receivable from related parties for over 1.6 million dollars. After reviewing these financial statements, GE asked Webb to provide complete disclosure of the transactions between Webb and KLWW. These transactions were referenced in the financial statements. GE says that, after it received the requested information, it realized that a portion of the rental receipts received by Webb were being used to fund the purchase and development of property owned by KLWW, and were not being used by Webb directly. GE then asked for a corporate guarantee from KLWW concerning the debt owed by Webb to GE. KLWW supplied this guarantee.

In May, 2001, a Liberty representative, Mr. Turpie, met with Webb officials to discuss Webb's financial condition. After that meeting, Mr. Turpie wrote a memorandum describing what he learned from Webb. *GE's Motion for Summary Judgment (GE's MSJ)*, Exhibit 16 (Turpie Memorandum). The Turpie Memorandum notes that the Gypsum property is owned by KLWW, and notes the ownership positions of the Webbs and another investor in KLWW. It also notes that 200,000 dollars of the purchase price for the Gypsum property "came from Webb." *Id.*, p.1. However, only five acres of the forty-acre property were needed for Webb's operations. *Id.* Turpie noted that KLWW had spent "roughly an additional 300,000 dollars for permitting and development costs at Gypsum." *Id.* By May, 2001, Liberty was aware

that KLWW planned to develop the SCIP, and that Webb had invested at least 200 thousand dollars in the project.

By October, 2002, GE had obtained two analyses of Webb's financial condition, including its role in developing the SCIP.  First, an appraisal of the SCIP property by Cushman & Wakefield indicated that Webb would have to expend an additional 580 thousand dollars to complete the development of the SCIP before lots sales could begin.  *Liberty's response to GE's motion for summary judgment (Response)*, Exhibit 54.  Second, a report by the Focus Group analyzed Webb's financial condition and outlined two options for Webb to repay the debt owed to GE.  *Response*, Exhibit 62. Liberty says GE knew of the terms of the loan agreements between Liberty and Webb, via the Focus Group report or otherwise.  Liberty claims also that GE knew that Webb could complete the SCIP development only if borrowed more money from Liberty, and improperly diverted that money to the SCIP.  Liberty cites page six of the Focus Group report and an excerpt of deposition testimony in support of this factual assertion. *Response*, p. 12-13, Exhibits 59, 62.  I find that these exhibits indicate only that Webb would have to borrow additional money to complete the SCIP development, and not that Webb would have to use the Liberty line of credit.

On November 1, 2002, GE and Webb executed a restructuring agreement (Restructuring Agreement).  The agreement required Webb to give GE 50 to 75 percent of the net profits from the sale of SCIP lots.  In addition, GE was granted a deed of trust on the SCIP property, and a right to the proceeds of any third-party investment in the SCIP property.  Finally, the agreement required Webb to pay the taxes, assessments, and the debt to the first lien holder on the SCIP property.  Of

course, these requirements protected GE by giving it additional security for the debt owed to GE, and by protecting the value of the security, the SCIP property.  Liberty claims that GE knew these requirements could be met only if Webb borrowed from Liberty and improperly diverted the funds to the SCIP project.  At about the same time, Liberty says it renewed its line of credit with Webb, based on false financial statements provided by Webb.  *Response*, p. 13.

In early 2003, Webb failed to make its required payments to Liberty.  On may 30, 2003, GE and Webb executed a voluntary surrender agreement under which Webb voluntarily surrendered to GE the equipment financed by GE.  Later the same day, GE and other creditors filed involuntary bankruptcy petitions against Webb and KLWW.

Liberty asserts ten claims against GE, claims 10 through 19 in the Complaint, and GE seeks summary judgment on each of Liberty's 10 claims.  These 10 claims are analyzed below.

## II.  CLAIMS 10 THROUGH 13
### AIDING AND ABETTING

In claims 10 through 13, Liberty alleges that GE aided and abetted Webb's breach of a fiduciary duty owed to Liberty, and Webb's fraud against Liberty.  I conclude that GE is entitled to summary judgment on each of Liberty's aiding and abetting claims.  Viewing the facts in the record in the light most favorable to Liberty, no reasonable fact finder could conclude that the actions taken by GE amount to aiding and abetting Webb's alleged breach of fiduciary duty or fraud.

Liberty's 10th claim, aiding and abetting breach of fiduciary duty, provides a good example of the relevant analysis.  Liberty claims Webb, as an insolvent debtor,

owed Liberty a fiduciary duty.   Liberty alleges that Webb breached its duty to Liberty by 1) fraudulently transferring funds from Webb to KLWW; 2) not disclosing these transfers to Liberty; and 3) "otherwise misrepresenting and concealing the purpose of the funds." *Second Amended Complaint*, ¶ 84.  Liberty alleges that GE "knowingly and intentionally aided and abetted and contractually obligated" Webb and others to breach their fiduciary duty to Liberty.  *Id.*, ¶ 85.

GE and Liberty agree that one of the elements Liberty must prove to establish this claim is that GE, through an affirmative act, knowingly participated in a breach of a fiduciary duty owed to Liberty.  ***Holmes v. Young***, 885 P.2d 305, 308 -09 (Colo. App. 1994) (stating elements of claim)(citing Restatement (Second) of Torts, § 874 comment c (1977)).  The Colorado cases analyzing a claim of aiding and abetting breach of fiduciary duty are few.  However, cases from other jurisdictions track the elements defined in ***Holmes*** and in § 874 of the Restatement.  Most notably, other cases hold that a defendant is liable as an aider and abettor only if the defendant substantially assists in the principal violation, or provides substantial inducement to commit the violation.  ***See, e.g., Halberstam v. Welch***, 705 F.2d 472, 477 (D.C. Cir. 1983); ***In re Sharp Int'l Corp.***, 403 F.3d 43 (2nd Cir. 2005).   Recently, the Second Circuit, in a case similar to the present case, concluded that inducement means the "act or process of enticing or persuading another person to take a certain course of action." ***In re Sharp Int'l Corp.***, 403 F.3d at 50 (quoting *Black's Law Dictionary* at 790 (8th ed. 2004)).  Substantial assistance may be found, the ***Sharp*** court concluded, only when the "alleged aider and abettor affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." ***Id***. (internal quotation

omitted).  Viewing the evidence in the record in the light most favorable to Liberty, I

conclude that a reasonable fact finder could not conclude that GE provided

substantial assistance or inducement to Liberty's alleged breach of fiduciary duty.

*Sharp* also involved a distressed debtor, and creditors seeking to protect their

positions in the face of the debtor's insolvency.  Over a period of years, Sharp

International Corporation was looted by its controlling shareholders.  In addition, the

controlling shareholders falsely inflated Sharp's sales, inventory, accounts receivable,

and customer lists in Sharp's financial statements.  Based on these false financial

statements, Sharp borrowed increasingly large sums of money from a succession of

banks and other lenders.  The shareholders then looted the fraudulently raised funds

and corporate profits from Sharp.

One of Sharp's lenders, State Street, began to suspect fraud at Sharp in the

Summer of 1998.  State Street's investigation confirmed its suspicion in some

respects, and State Street then made efforts to recover the money Sharp owed to

State Street. According to the plaintiff's complaint in *Sharp*:

> State Street demanded and obtained Sharp's agreement to secure new
> financing from investors unaware of the fraud, and to use that financing
> to pay off State Street's line of credit.  In exchange, State Street agreed to
> give Sharp until March 31, 1999 to obtain this new financing and to retire
> the State Street debt.

403 F.3d at 47.  Sharp then approached creditors who already held notes from Sharp

and obtained an additional 25 million dollars in financing from those note holders.

While Sharp pursued the additional financing, State Street gave no warnings to other

creditors, ignored inquires from the note holders, preserved Sharp's line of credit with

State Street even though State Street had the right to foreclose, and gave Sharp State Street's consent to the new debt. *Id*. at 48.

Before the end of March, 1999, Sharp paid State Street 12.25 million dollars of the 15 million dollars Sharp owed State Street, and the controlling shareholders gave State Street personal promissory notes for the remaining 2.75 million dollars. In September, 1999, the note holders filed an involuntary bankruptcy proceeding against Sharp. The bankruptcy trustee for Sharp then sued State Street claiming, among other things, that State Street was liable for aiding and abetting Sharp's breach of fiduciary duty to the note holders.

In *Sharp*, the Second Circuit concluded that the above facts do not establish substantial assistance or inducement to the fraud committed by Sharp. The plaintiff claimed that State Street's demand that Sharp obtain financing elsewhere, in order to pay State Street, induced Sharp's breach of its fiduciary duty to the note holders. The court noted that the demand for payment could be seen as an inducement, but held that State Street's "demand for repayment of a bona fide debt is not a corrupt inducement that would create aider and abettor liability." *Id*. at 51. Concerning State Street's failure to reveal Sharp's fraud to Sharp's other creditors, the court concluded that State Street had no independent duty to reveal the fraud to other creditors and, absent a duty to act, State Street's "silence and forbearance did not assist the fraud affirmatively." *Id*. at 52.

Liberty does not argue that GE's non-disclosure of Webb's fraud constitutes substantial assistance. As in *Sharp*, GE had no duty to disclose its knowledge of Webb's wrongdoing to other creditors. However, Liberty argues that GE provided

substantial assistance and inducement to Webb when GE required Webb, KLWW, and its principals to take certain actions.  These requirements are contained in the November 1, 2002, Restructuring Agreement.  Again, the agreement required Webb & KLWW to give GE 50 to 75 percent of the net profits from the sale of SCIP lots, to grant GE a deed of trust on the SCIP property, and to give GE the right to the proceeds of any third-party investment in the SCIP property.  Finally, the agreement requires that Webb pay the taxes, assessments, and the debt to the first lien holder on the SCIP property.

Following the Restructuring Agreement, Liberty says additional funds were borrowed from Liberty by Webb to improve and maintain the SCIP, as required by the Restructuring Agreement.  Such diversions were improper under the terms of Liberty's agreement with Webb.  According to Liberty, GE "acted in a predatory and unreasonable manner in its lending relationship with (Webb) in its handling of the SCIP, [and] the false financial statements and improper diversions from the line of credit." *Response*, filed December 3, 2004, p. 14.

Assuming that GE knew that Webb was making false representations to Liberty, and that Webb was using money borrowed from Liberty for purposes not permitted by the agreement between Webb and Liberty, I still cannot conclude that the evidence in the record demonstrates that GE provided substantial inducement or assistance to Webb's alleged breach of its fiduciary duty to Liberty.  As in **Sharp**, the most GE did was to act to increase GE's security, and to pressure Webb to find sources of funding to finish the development of the SCIP.  As in **Sharp**, such actions by GE do not constitute substantial inducement or assistance.  Rather, they constitute

actions by GE to ensure the payment of a legitimate debt owed to GE by Webb.  GE is entitled to summary judgment on Liberty's claim 10.

In claims 11, 12, and 13, Liberty alleges that GE aided and abetted Webb's fraudulent transfers, fraudulent misrepresentations to Liberty, and fraudulent concealment of material facts from Liberty.  To establish aiding and abetting liability as to the fraud claims, Liberty again must show that GE substantially assisted in the principal violation, or provided substantial inducement to commit the violation.  To demonstrate substantial assistance or inducement concerning the fraud claims, Liberty relies on the same facts discussed in relation to claim 10, above.  GE required Webb to take certain actions, which gave GE additional security for the debt owed to GE, and which protected and enhanced the value of that security.  Liberty claims these actions constitute substantial assistance and inducement.  For the reasons outlined in relation to claim 10, above, I conclude that no reasonable fact finder could conclude that GE's actions constitute substantial assistance or inducement to Webb's alleged fraudulent actions.  Therefore, GE is entitled to summary judgment on claims 11, 12, and 13.

### III.  CLAIM 14
### CIVIL CONSPIRACY

In its 14th claim for relief, Liberty alleges that GE, Webb, KLWW, and certain individuals "consciously conspired and deliberately pursued a common plan" with the "unlawful objective of benefitting" the conspiring defendants at the expense of Liberty.  *Complaint*, ¶ 103.  Liberty alleges that the defendants had an "explicit or tacit meeting of the minds," and pursued their agreement through Webb's fraudulent concealment, fraudulent misrepresentations, fraudulent transfer of funds, and through GE's

allegedly improper repossession of Webb's property, in violation of the bankruptcy stay. *Complaint*, ¶¶ 104 - 105.

Under Colorado law, a claim of civil conspiracy has four elements[2]:

1) The defendant and at least one other person agreed, by words or conduct, to accomplish an unlawful goal or to accomplish a goal through unlawful means;

2) One or more unlawful acts were performed to accomplish the goal or one or more acts were performed to accomplish the unlawful goal;

3) The plaintiff had damages; and

4) The plaintiffs damages were caused by the acts performed to accomplish the goal.

GE argues that Liberty cannot prove its civil conspiracy claim because Liberty cannot establish the performance of an unlawful act "with respect to GE Capital." *GE's MSJ*, p. 21. This is true, GE argues, because Liberty cannot establish any knowing or substantial assistance, inducement, or encouragement by GE concerning the alleged underlying unlawful acts.  Id.

The prime distinction between civil conspiracies and aiding-abetting is that a conspiracy involves an agreement to participate in a wrongful activity.  Aiding-abetting focuses on whether a defendant knowingly gave "substantial assistance" to someone who performed wrongful conduct, not on whether the defendant agreed to join the wrongful conduct.

**Halberstam v. Welch**, 705 F.2d 472, 478 (D.C. Cir. 1983).  If GE agreed with Webb and others to accomplish a goal through unlawful means, GE would be subject to liability for civil conspiracy, assuming the other three elements of such a claim also were proven.  However, proof that GE assisted, induced, or encouraged unlawful acts is not necessary to establish a civil conspiracy claim.  The performance of an unlawful

---

[2]  *See* **CJI-Civ. 4th 27:1** and the concomitant **Notes on Use** and **Source and Authority**.

act by another party to the conspiracy, even without GE's assistance or encouragement, would be sufficient. As discussed above, the evidence in the record does not support a finding that GE provided substantial assistance, inducement, or encouragement to the alleged unlawful acts of Webb. The absence of such proof, however, does not, by itself, defeat Liberty's civil conspiracy claim against GE.

GE argues also that Liberty knew that Webb was diverting funds borrowed from Liberty to the SCIP project, in violation of Webb's loan agreement with Liberty. Given that knowledge, GE argues, Liberty cannot claim that it has suffered harm as the result of the alleged civil conspiracy to continue diverting funds borrowed from Liberty. Again, I disagree. Even assuming Liberty's knowledge of the diversions, Liberty still might prove that it was harmed by fraudulent acts undertaken as part of the alleged conspiracy. Liberty's knowledge of what was happening might be seen as supporting a defense of waiver or estoppel, but such knowledge does not undermine Liberty's ability to prove that it was harmed by unlawful acts undertaken as part of the alleged conspiracy.

On the current record, GE is not entitled to summary judgment on Liberty's civil conspiracy claim. However, I note that neither party has discussed the question of whether there is sufficient evidence to prove that GE agreed with others to accomplish an unlawful goal, or to use unlawful means to accomplish a goal. At the conclusion of this order, I will invite further briefing on this issue.

## IV.  CLAIM 15
### INTENTIONAL INTERFERENCE WITH CONTRACT

The parties agree that to prove its claim of intentional interference with contract, Liberty must establish that GE induced Webb to breach its loan contract with Liberty.

Liberty claims that GE entered into the November 1, 2002, Restructuring Agreement knowing that Webb could not perform its duties under the Restructuring Agreement without breaching Webb's loan agreement with Liberty.  As described above, Liberty claims it was impossible for Webb to perform its duties under the Restructuring Agreement without borrowing more money from Liberty, and improperly diverting that money to fund the SCIP development.

For the reasons outlined in Section II of this order, above, I conclude that the evidence in the record is not sufficient to support a finding that GE induced Webb to breach Webb's contract with Liberty.  Viewing the facts in the record in the light most favorable to Liberty, a reasonable fact finder could not conclude that GE's efforts to obtain additional security for the money owed to GE amount to an inducement that would sustain a claim of intentional interference with contract.  Thus, GE is entitled to summary judgment on Liberty's intentional interference with contract claim.

## V.  CLAIM 16
## DECLARATORY JUDGMENT

Liberty seeks a declaratory judgment holding that GE's security agreement with Webb is void because the collateral subject to the security agreement is not described adequately in the security agreement.  Both Liberty and GE seek summary judgment on this claim.

On October 23, 1998, GE and Webb executed a security agreement.  *Liberty's Motion for Summary Judgment*, Exhibit A.  The agreement describes the collateral that is subject to GE's security interest as follows:

> The term "Collateral," as used herein shall include all of the following: (i) All inventory which is financed by Lender consisting of all goods (including without limitation, construction, materials handling and other

types of related equipment) and related trade-ins, now or hereafter owned or in the possession, custody or control of Borrower [Webb Crane], wherever located, together with all attachments, accessories, additions, accessions and substitutions, including all returns and repossessions thereof (collectively, the "Inventory"); (ii) All leases, accounts, contracts rights, chattel paper and rental instruments with respect to the Inventory, now owned or hereafter existing in favor of, or acquired by, Borrower (collectively, the "Contracts"); (iii) All reserves or credits, however created, and any other property of, or belonging to, Borrower now or hereafter in the possession or control of Lender, and all of Borrower's rights to any rebates, discounts, prepayments, credits, factory holdbacks and incentive payments which may become due to Borrower by any supplier, distributor or manufacturer of Inventory with respect to any of the Inventory (collectively, "Credits"); (iv) and all cash, rents and non-cash proceeds of the above described Inventory, Contracts or Credits, including but not limited to insurance payable by reason of loss or damage to any of the Inventory.

*Id.*, ¶ 2 (a).

Under the terms of the security agreement, New York law controls. **N.Y. U.C.C. Law § 9-108** (McKinney 2004), defines the requirements for a sufficient description of collateral in a security agreement. This section provides that a description of personal property "is sufficient, whether or not it is specific, if it reasonably identifies what is described." **Id.** The statue gives examples of reasonable identification, including a description that identifies the collateral by "computational or allocational formula or procedure." § 9-108(b)(5). GE argues that the collateral description in the security agreement satisfies this standard. I agree.

One of the key purposes of a collateral description in a security agreement is to permit interested parties to identify the items that are subject to the security interest.

The purpose of requiring a description of collateral in a security agreement under Section 9-203 is evidentiary. The test of sufficiency of a description under this section . . . is that the description do the job assigned to it: make possible the identification of the collateral described. This section rejects any requirement that a description is

insufficient unless it is exact and detailed (the so-called "serial number" test).

**N.Y. U.C.C. Law § 9-108**, Comment 2 (McKinney 2004).

Under the UCC, the identification of a secured party's collateral is adequate if it is "reasonably" specific. Normally, the designation of the generic "type" of collateral covered by a security agreement will be found to be sufficient. Moreover, the purpose of judicial inquiry is solely to establish, first, whether the written description may reasonably be construed to include the disputed property, and secondly, whether the parties intended that the description include that property.

**General Elec. Capital Commercial Automotive Finance, Inc. v. Spartan Motors, Ltd.**, 246 A.D.2d 41, 52-53 (N.Y.A.D. 2 Dept.,1998) (citations omitted). The **Spartan Motors** court was applying § 9-110, which later was superceded by § 9-108.

GE notes that the financing it provided to Webb was dealer floor plan financing. Typically, such financing permits a business to borrow money to purchase items to hold in inventory for re-sale or, in this case, for sale or for rental. Usually, the lender retains a lien on those inventory items purchased using money borrowed from the lender. The particular assets subject to the lender's security interest change as the business sells inventory and purchases new inventory. Because the particular assets subject to the lender's security interest are variable, the security agreement cannot identify the collateral by specifying serial numbers or other details that identify particular items.

The **Spartan Motors** case involved dealer floor plan financing. The description of collateral in Spartan Motors' security agreement with its lender, GMAC, included the following language:

The collateral subject to this Wholesale Security Agreement is new vehicles held for sale or lease and used vehicles acquired from manufacturers or distributors and held for sale or lease * * * We

> [Borrower] understand that we may sell and lease the vehicles at retail in the ordinary course of business. We further agree that as each vehicle is sold, or leased, we will faithfully and promptly remit to you the amount you advanced or have become obligated to advance on our behalf to the manufacturer, distributor or seller.

*Id*. at 44.  The **Spartan Motors** court concluded that "GMAC's security agreement and its timely notice to GECC adequately specified the precise nature of the vehicular inventory to which its lien attached . . . ."  **Spartan Motors**, 246 A.D.2d at 52 (N.Y.A.D. 2 Dept.,1998).

Liberty claims that the property subject to GE's security agreement cannot be identified based on the description of the collateral in the security agreement, and, thus, the description does not satisfy the requirements of § 9-108.  The collateral description, by itself, does not permit someone to identify particular pieces of equipment owned by Webb that are subject to GE's security interest.  However, the description does alert interested parties that some, and possibly all, of Webb's equipment is subject to GE's security interest.  On inquiry to GE and Webb, an interested party could identify the particular equipment that was financed by GE, and items related to such equipment.   Particularly in the context of floor plan financing, such an inquiry is the only reasonable way to identify the relevant collateral at a particular time.  The collateral description in the security agreement "make[s] possible the identification of the collateral described."  **N.Y. U.C.C. Law § 9-108**, Comment 2 (McKinney 2004).  The collateral description in GE's security agreement is sufficient as a matter of law.  Liberty is not entitled to summary judgment on its declaratory judgment claim, and GE is entitled to summary judgment on Liberty's declaratory judgment claim.

## VI.  CLAIM 17
## CONVERSION

In May, 2003, GE and Webb executed a voluntary surrender agreement.  *GE's MSJ*, Exhibit 30.  Under the agreement, Webb agreed to surrender to GE all equipment that was subject to GE's security interest.  GE sold the collateral that was subject to the security interest.  Liberty claims that GE's repossession of the collateral constitutes conversion.

Liberty argues that if the security agreement "is void as a matter of law [because of an inadequate collateral description], then GE had no rights to the equipment; and therefore, converted the equipment when it repossessed and sold it . . . ."  *Response*, p. 25.  To establish its conversion claim, Liberty must prove that the security agreement is void.  As discussed in Section V, above, Liberty has not demonstrated that the security agreement is void.  GE is entitled to summary judgment on Liberty's conversion claim.

## VII.  CLAIM 18
## EQUITABLE SUBORDINATION

Liberty seeks equitable subordination of GE's security interest under 11 U.S.C. § 510(c)(1), based on GE's alleged bankruptcy fraud.  A party seeking equitable subordination under § 510(c) must show 1) that the claimant has engaged in inequitable conduct; 2) that the conduct has injured creditors or given unfair advantage to the claimant; and 3) that subordination of the claim is not inconsistent with the Bankruptcy Code.  *In re Castleons, Inc.*, 900 F.2d 551, 559 (10th Cir. 1993).

> The purpose of equitable subordination is to distinguish between the unilateral remedies that a creditor may properly enforce pursuant to its agreements with the debtor and other inequitable conduct such as fraud, misrepresentation, or to exercise such total control over the debtor

as to have essentially replaced its decision-making capacity with that of the lender.

*Id*. at 559 (quoting *In re Clark Pipe & Supply Co.*, 893 F.2d 693, 701 n.3 (5th Cir. 1990)).

Liberty claims that GE engaged in inequitable conduct in two ways: First, Liberty alleges that GE misrepresented to the bankruptcy court that GE had claims against KLWW based on fraudulent transfers from Webb to KLWW. In a rider filed with the KLWW bankruptcy petition, GE stated that "(b)y virtue of the findings of the District Court in the State Court Action, Petitioners also have claims against KLWW as the recipient of fraudulent transfers from Webb." *GE's MSJ*, Exhibit 32, last page. GE argues that, even if it did know that Webb was defrauding Liberty and making fraudulent transfers to KLWW, that knowledge does not defeat a claim by GE for fraudulent transfers from Webb to KLWW. I agree. As GE points out, GE's alleged knowledge of Webb's fraudulent transfers when they were made is not relevant to a fraudulent transfer claim under the Colorado statues on which Liberty relies. §§38-8-105(1) and 38-8-106, C.R.S. The evidence in the record does not support a finding that GE's statement in the KLWW petition was a misrepresentation. Absent such a finding, this statement does not support an arguable equitable subordination claim.

Second, Liberty alleges that GE intentionally violated 11 U.S.C. § 362(a)(6) and 18 U.S.C. § 152 (5) when GE repossessed and sold the collateral covered by GE's security agreement, in violation of the automatic stay imposed under the Bankruptcy Code. Webb and GE executed a voluntary surrender agreement concerning GE's collateral on May 30, 2003. *GE's MSJ*, Exhibit 30. Later the same day, GE filed a

bankruptcy petition against Webb.  GE says that the collateral never became part of the bankruptcy estate because it was surrendered to GE before the bankruptcy petition was filed.  I agree, and Liberty has not asserted any argument to the contrary. This view of the facts is buttressed by the order entered by the Bankruptcy Court on July 24, 2003, which provided that the automatic stay, if applicable to the collateral, was lifted.  *GE's MSJ*, Exhibit 37.

Finally, as GE notes, the Bankruptcy Court entered an Order for Relief in the Webb bankruptcy on June 17, 2003.  When an involuntary bankruptcy petition is filed "the rights of parties do not become fixed and the debtor's property does not pass out of his hands into the bankruptcy estate until the order for relief, because in the interim between the filing of the involuntary petition and the entry of the order for relief, the debtor may use, acquire or dispose of property as if the involuntary case had not been filed."  **In re Hodes**, 235 B.R. 104, 109 (Bankr. Kan. 1999) (citing **In re Andreotti**, 16 B.R. 28, 30 -31 (Bankr. E.D. Cal. 1981)).  Even if GE's collateral was Webb's property when the involuntary petition was filed, Webb's disposition of the collateral in the interim between the petition and the order for relief did not violate the automatic stay. GE's repossession of its collateral does not support an equitable subordination claim.

Viewing the undisputed facts in the record in the light most favorable to Liberty, I find that no reasonable fact finder could conclude that GE's engaged in inequitable conduct that supports an equitable subordination claim under 11 U.S.C. § 510(c)(1).

## VIII.  CLAIM 19
## UNJUST ENRICHMENT

Finally, Liberty asserts a claim of unjust enrichment based on others' fraudulent transfers in claim 19.   The parties agree that the first element that Liberty must prove to establish an unjust enrichment claim is that Liberty conferred a benefit on the defendant.  ***See, e.g., Kennedy v. Hudon***, 659 F. Supp. 900, 906 (D. Colo. 1987).   Under the Colorado rule, as discussed in ***Kennedy***, if the party conferring the benefit (Liberty) does so pursuant to a contract with a third party (Webb), then the nonperformance of the contract by the third party (Webb) does not entitle the party conferring the benefit (Liberty) to repayment from the recipient of the benefit (GE).  ***Id***. (citing ***Restatement of Restitution*** § 110 (1937)).

The undisputed facts show that Liberty loaned money to Webb, and Webb diverted some of that money to KLWW.  GE took security interests in some KLWW property, and thus allegedly obtained some benefit from the money loaned by Liberty to Webb.  Under the rule stated in ***Kennedy***, these facts do not support an unjust enrichment claim.  GE is entitled to summary judgment on Liberty's unjust enrichment claim.

## IX.  CONCLUSION AND ORDERS

Based on the foregoing, I find that GE is entitled to summary judgment on claims 10, 11, 12, 13, 15, 16, 17, 18, and 19, as stated in Liberty's Second Amended Complaint.  I find further that GE is not entitled to summary judgment on Liberty's civil conspiracy claim, claim 14.  Finally, I find that Liberty is not entitled to summary judgment on its declaratory judgment claim, claim 16.

**THEREFORE, IT IS ORDERED** as follows:

1) That defendant General Electric Capital Corporation's motion for summary judgment against plaintiff [#153], filed November 1, 2004, is **GRANTED** as to claims 10, 11, 12, 13, 15, 16, 17, 18, and 19 in plaintiff's Second Amended Complaint;

2) That defendant General Electric Capital Corporation's motion for summary judgment against plaintiff [#153], filed November 1, 2004, is **DENIED** as to claim 14 in the Second Amended Complaint;

3) That plaintiff Liberty Savings Bank, FSB's motions for summary judgment [#s 156 and 158], filed November 1 and November 3, 2004, are **DENIED**;

4) That defendant General Electric Capital Corporation **MAY FILE** a supplemental motion for summary judgment, not to exceed ten pages, concerning Liberty's civil conspiracy claim, claim 14, on or before **August 19, 2005**; and

5) That if defendant General Electric Capital Corporation timely files a supplemental motion for summary judgment, the response and reply shall be filed in the time and manner prescribed by D.C.COLO.LCivR 7.1 C.

Dated July 27, 2005, at Denver, Colorado.

BY THE COURT:


s/ Robert E. Blackburn
Robert E. Blackburn
United States District Judge