**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn**

Civil Case No.  03-cv-2218-REB-CBS

LIBERTY SAVINGS BANK, FSB,

    Plaintiff,

v.

WEBB CRANE SERVICE, INC., a Colorado corporation,
JEFFREY A. WEINMAN, the Webb Crane Service, Inc., Chapter 7 Bankruptcy Trustee,
KLW & W, LLC, a Colorado corporation,
DAVID E. LEWIS, the KLW & W, LLC Chapter 7 Bankruptcy Trustee,
WILLIAM WEBB (a/k/a Will Webb), an individual,
KELLY WEBB, an individual,
LESLIE WEBB, an individual,
JOHN FORIER, an individual. and
GENERAL ELECTRIC CAPITAL CORPORATION, a Delaware corporation,

    Defendants.

**ORDER GRANTING DEFENDANT GE CAPITAL'S
SUPPLEMENTAL MOTION FOR SUMMARY JUDGMENT**

**Blackburn, J.**

This matter is before me on defendant **GE Capital's Supplemental Motion for Summary Judgment on Liberty's Sole Remaining Claim Against It** [#203], filed August 19, 2005.  I grant the motion.[1]

---

[1] The issues raised by and inherent to the motion for summary judgment are fully briefed, obviating the necessity for evidentiary hearing or oral argument. Thus, the motion stands submitted on the papers. *Cf.* **FED. R. CIV. P. 56(c)** and **(d)**. *Geear v. Boulder Cmty. Hosp.,* 844 F.2d 764, 766 (10th Cir.1988) (holding that hearing requirement for summary judgment motions is satisfied by court's review of documents submitted by parties).

## I. JURISDICTION

I have subject matter jurisdiction under **28 U.S.C. 1332** (diversity).

## II. STANDARD OF REVIEW

Under **FED. R. CIV. P. 56(c)**, summary judgment is proper only if the evidence, viewed in a light most favorable to the nonmoving party, demonstrates that there is no genuine issue as to any material fact, and the moving party is entitled to summary judgment as a matter of law. *Farthing v. City of Shawnee, Kan*. 39 F.3d 1131, 1134 (10th Cir. 1994). A "material" fact is one "that might affect the outcome of the suit under the governing law," *Id.* at 1135 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)), and a "genuine" issue is one where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* (citing *Anderson*, 477 U.S. at 248).

I have carefully reviewed the record in this case, including the pleadings, discovery, and affidavits on file, I have carefully considered the reasons stated, arguments advanced, and authorities cited by the parties in their papers. I have employed the analysis required by apposite law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Applied Genetics Int'l, Inc. v. First Affiliated Sec., Inc.,* 912 F.2d 1238, 1241 (10th Cir.1990); *Redmon v. United States*, 934 F.2d 1151,1155 (10th Cir. 1991); and *Concrete Works, Inc. v. City & County of Denver*, 36 F.3d 1513, 1517 (10th Cir.1994).

### III.  FACTS

This case concerns a claim by a creditor, plaintiff, Liberty Savings Bank, FSB (Liberty), that its debtor, defendant Webb Crane Service, Inc. (Webb), defrauded Liberty by making false statements in the financial statements Webb provided to Liberty, and by using funds borrowed from Liberty for purposes not authorized under the terms of the loan agreement between Liberty and Webb.  In the civil conspiracy claim at issue here, Liberty claims also that a second creditor of Webb, defendant GE Capital Corporation (GE), conspired with Webb to perpetrate the alleged fraud on Liberty.  The complaint at issue is the plaintiff's second amended complaint [#101], filed September 13, 2004 (Complaint).

On July 27, 2005, I entered an order granting GE's motion for summary judgment as to all of Liberty's claims against GE, except for Liberty's civil conspiracy claim.  I invited further briefing from the parties on the civil conspiracy claim, and GE then filed its supplemental motion for summary judgment concerning the civil conspiracy claim.  Liberty has filed a response, and GE has filed a reply.  In resolving GE's current motion, I will consider the evidence cited by the parties in their briefs concerning GE's supplemental motion, and I will consider the evidence submitted to the court concerning GE's motion for summary judgment against plaintiff [#153], filed November 1, 2004.

Webb operated a crane rental service.  From March, 1997, through March, 2003, Liberty provided a revolving line of credit to Webb.  At all times, Webb promised

that proceeds from the line of credit would be used only for the operations of Webb's crane business. William, Leslie, and Kelly Webb (the Webbs) were the shareholders, directors, and officers of Webb Crane at the relevant times.  In 1996, before Webb had a financial relationship with Liberty, William, Kelly, and Leslie Webb, along with another individual, formed a limited liability company known as KLW&W, LLC (KLWW). KLWW was created to purchase and hold a forty-acre parcel of real estate in Gypsum, Colorado.  KLWW planned to use a portion of the Gypsum property for a new facility for Webb's planned expansion into the Western slope area of Colorado.  The remainder of the site was to be developed and sold in parcels.  The development was named the Spring Creek Industrial Park (SCIP).  Beginning in 1997, Webb began diverting some of its funds to KLWW to fund the purchase and development of the Gypsum property.  Liberty alleges that some of these diversions involved funds loaned to Webb by Liberty, which were used improperly for purposes other than the operation of Webb Crane's business.  Liberty says about 750 thousand dollars of money it loaned to Webb was diverted to the SCIP.  *Response to supplemental motion for summary judgment (Response II)* [#208], filed September 7, 2005, p. 3.

GE supplied Webb Crane with equipment financing for the purchase of cranes and other equipment.  Webb rented, and sometimes sold, this equipment to its customers to generate income.  GE had a perfected security interest in the equipment it financed.

Webb provided financial statements for calendar years 2000 and 2001 to both Liberty and GE.  In its 2000 financial statement, according to GE, Webb reported for the first time that Webb held long term notes receivable from related parties for over

1.1 million dollars, and accounts receivable from related parties for over 1.6 million dollars. After reviewing these financial statements, GE asked Webb to provide complete disclosure of the transactions between Webb and KLWW. These transactions were referenced in the financial statements. After reviewing the requested information, GE says it realized that some of the income received by Webb based on Webb's rental of equipment financed by GE were being used to fund the purchase and development of the SCIP, and were not being used by Webb directly. GE then asked for a corporate guarantee from KLWW concerning the debt owed by Webb to GE. KLWW supplied this guarantee.

By October, 2002, GE had obtained two analyses of Webb's financial condition, including Webb's role in developing the SCIP. First, an appraisal of the SCIP property by Cushman & Wakefield indicated that Webb would have to expend an additional 580 thousand dollars to complete the development of the SCIP before lots sales could begin. *Liberty's response to GE's motion for summary judgment (Response I)* [#171], filed December 6, 2004, Exhibit 54. Second, a report by the Focus Group analyzed Webb's financial condition and outlined two options for Webb to repay the debt owed to GE. *Response I*, Exhibit 62.

Liberty says GE knew of the terms of the loan agreements between Liberty and Webb, via the Focus Group report or otherwise. Liberty claims also that GE knew that Webb could complete the SCIP development only if Webb borrowed more money from Liberty, and improperly diverted that money to the SCIP. Liberty cites page six of the Focus Group report and an excerpt of deposition testimony in support of this factual assertion. *Response I*, p. 12-13, Exhibits 59, 62. These exhibits indicate only that

Webb would have to borrow additional money to complete the SCIP development, and not that Webb would have to use the Liberty line of credit.

On November 1, 2002, GE and Webb executed a restructuring agreement (Restructuring Agreement). *Response II*, Exhibit J. The agreement required Webb to give GE 50 to 75 percent of the net profits from the sale of SCIP lots. In addition, GE was granted permission to partially secure the debt owed to it by placing a deed of trust on the SCIP property, and a right to the proceeds of any third-party investment in the SCIP property. Finally, the agreement required Webb to pay the taxes, assessments, and the debt to the first lien holder on the SCIP property. Of course, these requirements protected GE by giving it additional sources of payment for the debt owed to GE, additional possible security for its debt, and by protecting the value of the security, the SCIP property. Liberty claims that GE knew these requirements could be met only if Webb borrowed from Liberty and improperly diverted the funds to the SCIP project. At about the same time, Liberty says it renewed its line of credit with Webb, based on false financial statements provided by Webb. *Response I*, p. 13.

The Restructuring Agreement was modified and reaffirmed in a Modification Agreement dated February 27, 2003. *Response II*, Exhibit K. In the Modification Agreement, GE agreed to permit Webb to skip four payments of principal due in the first four months of 2003. *Id.*, p. 2. The balance of the previous agreements between GE and Webb remained in effect.

In early 2003, Webb failed to make its required payments to Liberty. On may 30, 2003, GE and Webb executed a voluntary surrender agreement under which Webb

-6-

voluntarily surrendered to GE the equipment financed by GE.  Later the same day, GE and other creditors filed involuntary bankruptcy petitions against Webb and KLWW.

## IV. CIVIL CONSPIRACY

In its 14th claim for relief, Liberty alleges that GE, Webb, KLWW, and certain individuals "consciously conspired and deliberately pursued a common plan" with the "unlawful objective of benefitting" the conspiring defendants at the expense of Liberty. *Complaint*, ¶ 103.  Liberty alleges that the defendants had an "explicit or tacit meeting of the minds," and pursued their agreement through Webb's fraudulent concealment, fraudulent misrepresentations, and fraudulent transfer of funds.  *Complaint*, ¶¶ 104 - 105.

Under Colorado law, a claim of civil conspiracy has four elements[2]:

1) The defendant and at least one other person agreed, by words or conduct, to accomplish an unlawful goal or to accomplish a goal through unlawful means;

2) One or more unlawful acts were performed to accomplish the goal or one or more acts were performed to accomplish the unlawful goal;

3) The plaintiff had damages; and

4) The plaintiffs damages were caused by the acts performed to accomplish the goal.

GE argues that Liberty cannot prove its civil conspiracy claim because Liberty cannot establish the first element, that GE was part of an agreement to accomplish an unlawful goal, or an agreement to accomplish a goal through unlawful means.

> The court will not infer the agreement necessary to form a conspiracy; evidence of such an agreement must be presented by the plaintiff. ***More v. Johnson***, 193 Colo. 489, 494, 568 P.2d 437, 440 (1977). Additionally,

---

[2] See **CJI-Civ. 4th 27:1** and the concomitant **Notes on Use** and **Source and Authority**.

> the purpose of the conspiracy must involve an unlawful act or unlawful means. A party may not be held liable for doing in a proper manner that which it had a lawful right to do. **Contract Maintenance Co. v. Local No. 105**, 160 Colo. 190, 194-95, 415 P.2d 855, 857 (1966).

**Nelson v. Elway**, 908 P.2d 102, 106 (Colo. 1995).

Liberty argues that the November 1, 2002, Restructuring Agreement, and the surrounding circumstances, demonstrate that GE intended to receive payment on its debt from two sources concurrently. The first source, Webb Crane, was proper. The second source, funds derived from the SCIP was, according to Liberty, improper. According to Liberty, GE's effort to receive payment from funds derived from the SCIP was improper because the SCIP was funded by Liberty, and GE knew that Webb improperly was diverting money borrowed from Liberty to the SCIP. *Response II*, p. 5. Liberty claims the evidence supports its claim that GE and Webb conspired to interfere improperly with Webb's other creditors, including Liberty, when they devised the terms of the Restructuring Agreement. *Id.*

Liberty cites two specific reasons that the restructuring agreement amounts to an agreement to accomplish an unlawful goal or to accomplish a goal through unlawful means. First, Liberty claims GE and Webb agreed to use "lawful means in furtherance of an improper purpose" because they agreed to "aggrandize Liberty's contributions to the SCIP for (GE) by prohibiting KLWW from returning wrongfully taken money to Webb Crane, Liberty, and Webb Crane's creditors and instead paying it over to (GE) by way of lot sale proceeds." *Response II*, p. 9. Second, Liberty claims GE and Webb agreed to use "illegal means to repay (GE's) debt, i.e. the retention and further transfer of value and property that was fraudulently taken from Liberty to convey to (GE) as lot

-8-

proceeds." *Id*. In either case, Liberty argues, GE "agreed to share in Webb's fraud." *Id*.

I assume that at the time of the restructuring agreement, GE was aware that funds Webb had borrowed from Liberty had been diverted improperly by Webb to fund the SCIP. The evidence in the record indicates also that other Webb funds, funds not borrowed from Liberty, also had been diverted to KLWW to fund the development of the SCIP. Notably, Liberty claims that Webb had diverted about 1.5 million dollars of its money to the SCIP as of October 31, 2002. *Response I*, p. 9. Liberty's forensic accountant concluded that Webb transferred about 753 thousand dollars borrowed from Liberty to the SCIP project. *Response II*, Exhibit 6 (Aucone report).

The Restructuring Agreement permitted GE to obtain additional sources of payment for the debt it was owed by Webb and, at least on the surface, to enhance the security it held for the money it was owed by Webb. A creditor's efforts to enhance its prospects for repayment, and to enhance the security interests it holds for money it is owed, are not unlawful. Nothing in the agreement requires Webb to borrow further money from Liberty. Nothing in the agreement prohibits KLWW from repaying money it borrowed from Webb, nor does the agreement prohibit Webb from repaying money it borrowed from Liberty. Nothing in the agreement makes it impossible for KLWW to repay Webb, or for Webb to repay Liberty. The agreement contemplates completion of the development of the SCIP, and sale of lots in the SCIP. This goal does not indicate that Webb or GE sought to deprive Liberty of repayment of the debt it was owed.

As it turned out, Webb did not repay its debt to GE or to Liberty. GE did not record a deed of trust or any other type of lien against the SCIP property. *GE's reply in*

-9-

*support of motion for summary judgment* [#178], filed December 20, 2004, Exhibits 1 & 2. GE did not receive any payments from the proceeds of the sale of any SCIP lots, refinancing of the SCIP property, or otherwise under the Restructuring Agreement. *Id.*, Exhibit 1.

Nothing in the Restructuring Agreement, or in the surrounding circumstances, reasonably can be viewed as supporting the conclusion that GE and Webb agreed to deprive Liberty of repayment, or to fraudulently obtain additional funds from Liberty. The most GE did was to act to increase its sources of payment and its security when it saw that its debtor, Webb, was in some financial distress. The circumstances surrounding the Restructuring Agreement also can be read to indicate that GE acted to pressure Webb to find sources of funding to finish the development of the SCIP, in an effort to ensure that the debt owed to GE was repaid. These specific actions are proper, not unlawful. Again, a "party may not be held liable for doing in a proper manner that which it had a lawful right to do." **Contract Maintenance Co. v. Local No. 105**, 160 Colo. 190, 194-95, 415 P.2d 855, 857 (1966). Here, GE did in a proper manner that which it had a lawful right to do.

Viewing the facts in the record in the light most favorable to Liberty, I find that no reasonable fact finder could conclude that GE agreed with Webb to deprive Liberty of repayment from Webb, or to fraudulently obtain additional money from Liberty. Considering the terms of the Restructuring Agreement and the surrounding circumstances in the light most favorable to Liberty, no reasonable fact finder could conclude that GE and Webb agreed to accomplish an unlawful goal, or to accomplish a

l

-10-

awful goal via unlawful means.  Absent evidence of such an agreement, Liberty's civil conspiracy claim fails.

## V.  ORDERS

**THEREFORE, IT IS ORDERED** as follows:

1.   That defendant **GE Capital's Supplemental Motion for Summary Judgment on Liberty's Sole Remaining Claim Against It** [#203], filed August 19, 2005, is **GRANTED**;

2.   That claim 14 of Liberty's Second Amended Complaint [#101], filed September 13, 2004, is **DISMISSED** with prejudice; and

3.   That on or before **February 20, 2006**, the plaintiff shall file a status report listing the claims, counterclaims, and cross-claims that remain pending in this case, including a designation of the remaining parties to each such claim, counterclaim, or cross-claim.

Dated February 9, 2005, at Denver, Colorado.

                                          **BY THE COURT:**

                                          **s/ Robert E. Blackburn**
                                          **Robert E. Blackburn**
                                          **United States District Judge**